THE STATE OF OHIO, APPELLEE, v. LOUDERMILL, APPELLANT.

(No. 5765—Decided December 30, 1963.)

*Mr. Harry Friberg*, prosecuting attorney, and *Mr. Benjamin H. Fisher*, for appellee.
*Mr. Gene W. Krick*, for appellant.

SMITH, J. This appeal is on questions of law from a judgment of conviction and sentence to life imprisonment on a charge of murder in the second degree in violation of Section 2901.05, Revised Code, which reads as follows:

"No person shall purposely and maliciously kill another. Whoever violates this section, except in the manner described in Sections 2901.01, 2901.02, 2901.03, and 2901.04 of the Revised

Code, is guilty of murder in the second degree and shall be imprisoned for life.''

The indictment upon which defendant was tried for murder in the second degree charges that defendant on or about February 17, 1963, in Toledo, Lucas County, Ohio, ''Did purposely, and maliciously kill Doris Forrest.'' A plea of not guilty was entered, and, after trial, the court refusing to charge on lesser included offenses, the jury returned a verdict of guilty as charged and the court sentenced the defendant to be confined in the Ohio State Reformatory at Marysville for life.

Since the evidence in this case is important, and upon which our decision must turn, the operative facts are therefore set out chronologically at some length. The record reveals that defendant is married to Napoleon Loudermill, a construction worker, whose work required his absence from home for extended periods, but he would turn over his wages to defendant or through some friend. He would drink heavily with friends, particularly on weekends, notwithstanding her repeated remonstrances.

On Saturday, February 16, 1963, the husband took defendant to the home of the minister of her church for whom she occasionally worked, knowing she would be through at 4:30 p.m., at which time he was to pick her up in his car. It was about ten minutes after 5:00 p. m. when he arrived smelling of whiskey and making some excuses for being late. He drove defendant home and upon arrival he got out of the car and walked away and didn't return home that night. The following morning, February 17, 1963, one Tom Bradley came to defendant's home inquiring for her husband, the defendant not knowing his whereabouts. While he was there the defendant's son said that the defendant had a telephone call from a woman who ''sounded like Miss Virgie'' who didn't leave a message and said she would call back. Defendant was acquainted with ''Miss Virgie'' through a painting job Bradley and defendant's husband had done for her. Defendant tried to call back on the telephone which was busy. Whereupon the state's witness, Edna Hutchen, a friend, came to her home and asked defendant to take her to her aunt's house on Woodruff Avenue. Defendant consented, and Edna went to get her children. Defendant testified that, at this time:

''* * * I sat there for a moment, I didn't get my coat right

away,—and I was thinking, well, Napoleon knew Virgie, and he hasn't been home all night.

"And I felt like he had given her the money, or told her to call me for him."

She told Edna that she wanted to stop on Elizabeth Street to pick up some money. When she got near the place she saw her husband on a corner of the street intersection, stopped and asked him if he wanted a ride and he said "Yes, Virgie wants to talk to us."

Defendant agreed to go to Virgie's house and proceeded with her husband, Edna and her children. They got out of the car, went to the house and knocked on the door. Looking through the glass in the door, defendant recognized, at the time she knocked, a Doris Forrest (decedent) sitting at the table. Forrest jumped up, got her coat and pocketbook, made a noise as running and ran out the side door, slamming it as she went. Defendant and her husband entered the house, and defendant asked Virgie, "Wasn't that Doris that ran out of the side door?" Being told that it was, she asked, "Well, why did she run?" Virgie said she didn't know but mentioned that Doris was having difficulty with her car. Napoleon and Virgie both remarked that they didn't see why she would run. Thereupon Virgie volunteered as a peacemaker between defendant and her husband. She said that Napoleon came to her house and told her about arguments concerning his drinking, and counseled that they had small children, were buying a house and should stop arguing and act like adults, especially since he brings his wages home to defendant.

After defendant and her husband returned to their car, they drove to a gas station and purchased gas for $1.00 handed defendant by her husband. Later her husband gave his wages to defendant, less $35 which he said he had lost gambling. As they proceeded, Edna changed her destination and wanted to go to her mother-in-law's house. But upon reflection, the defendant drove to the house of Mrs. Forrest, mother of decedent, Doris, for the purpose of telling her that she saw Doris run. She said:

"Mrs. Forrest, I went to a house on Elizabeth Street, and when I knocked on the door Doris ran. If she ran because she saw me, or because she liked Napoleon, she didn't have to run, because I would give him a divorce."

Mrs. Forrest said she would tell Doris when she came home but she didn't believe that Doris liked Napoleon. Back in the car Napoleon said to the defendant: "Maggie, before you take Edna over to her mother-in-law's, you take me over to Virgie's. I had told John to pick me up before I saw you." He added that he had called John Cal to come over to Virgie's to pick him up. Defendant let him out of the car near his destination on Elizabeth Street and continued with Edna and her children. At Dorr and Forest Streets, Edna requested defendant to allow her older daughter to keep the children and she would go back with defendant to pick up Napoleon. Thereafter defendant and Edna continued to the corner of Belmont Street where she saw John's car in which there were two people.

The testimony of defendant at this point is as follows:

"* * * And I drove up beside John's car. Doris' car was in front of John's car, and I drove beside John's car and I had attempted to park, but when I did, John started to back up, and I blew the horn and I explained to Edna 'He don't know I'm trying to get his attention.' I had planned to ask John why was him and Napoleon leaving when he had told me to come back and pick him up.

"But when I got out of the car and I started to John's car I saw that it wasn't Napoleon, so I was going to tell him okay, but before I could say anything, Doris, she jumped out and we started to wrestle. She jumped out and struck me first. So this shocked me and we started to fight."

In previous testimony of defendant she related that sometime in the past she had purchased a small gun in 1960 at the suggestion of her husband for protection of her children from burglaries reported in the neighborhood of their home, that she had placed the gun in various coats to be concealed from her children, and that on this day she had in her hurry put on the coat in which the gun was in the pocket. Continuing the above quoted testimony, she was asked where the gun came from and she stated:

"Well John came around the car, my first attention to the gun was when John came around the car, when he grabbed me and the gun was practically out of my pocket. Well, I grabbed for the gun and he grabbed for it, me and him started to wrestle. Well, Doris was hanging on to me, too, we all was wrestling. And

then the gun started to go off, and she ran and we heard the car crash. And then John had the gun, by this time he had the gun, and I stood there for a moment because—we had wrestled and I didn't know why they had jumped on me. And then I saw all this smoke and this big crash. And so Edna came to me and she said 'Maggie, why was John and Doris fighting with you?.' I said 'I don't know, I don't know.' And I didn't know.''

She testified further as follows:

''Q. Did you know at the time Doris broke loose that she had been shot? A. No.''

The record shows further:

''Q. Maggie, did you intend to hurt or kill anybody? A. Nobody. I didn't even know Doris was over there because she had ran already away from the house and I had no—I didn't know she was over there; I didn't know John was there. I went back to pick up my husband. And I didn't know anybody else was going to be there.''

Defendant testified further that John told her that she had shot him in the hands, and she stated, ''I didn't shoot you, you was wrestling with me over the gun. You never would have gotten shot,'' and added that she didn't know he was shot.

The state's witness, Edna Hutchen, who was with the defendant at the time, corroborated in the main the testimony of the defendant. She said that while going to the house of Mrs. Forrest, the defendant told her husband: ''If he got this straightened out he could come home.'' Edna said she saw John and someone she later learned was Doris Forrest sitting in John's car parked near the house of Mrs. Virgie; that defendant backed her car in front of John's car, got out and walked over to John's car on the side Doris was sitting, and that Doris got out of the car; and that Doris was getting out of the car and they went together and started tussling, both standing up, and John grabbed the defendant.

''Q. Then what happened? A. Two bullets were fired, two shots.

''Q. These were after John had grabbed Maggie? A. Yes.

''Q. There is no question about that? A. No.

''Q. The gun did not go off until after John grabbed Maggie, is that right? A. No, I didn't hear it.''

Further, she said that Doris broke away, got into her car

and drove off into a pole; that defendant, when it was all over, said to call her mother in Decatur, Illinois, to take care of her children; that she believes she shot the girl in the head; "and she said she didn't do it because John did it, because he shouldn't been tussling with her."

The witness, John Cal, testified that he was at Mrs. Virgie's house when defendant and her husband came in. Doris had gone, her car was parked nearby, and defendant and her husband were arguing about the fact that Doris ran out the door. When John came out of Virgie's house, defendant and her husband had driven away. John further stated he drove to the home of Doris and brought her back to her car and parked behind Doris' car. Defendant drove her car up beside his and he then backed away and could not go forward because the defendant was blocking his way. She got out of her car and ran to his car. The witness testified further, that:

"Doris jumps out the car, opens the door to get out of the car, but they meets right at the door. The door slammed, they went together, and sounded like I heard a shot, door slam or firecracker, I wouldn't say which 'cause I don't know.

"I jumps out of the car and ran around to where they was fighting at. Doris was back on my car, and she had her hand reaching here for Mrs. Loudermill and Mrs. Loudermill here like this with the gun in her hand. I reached at the gun and it went off, 'bam.' And that's when it stung my fingers. And I reached over and started wrestling with her over the gun. The gun had gone off."

He then said he saw Doris get in her car and drive it against a post. The defendant said nothing during the scuffling. John went to her car and said: "You done shot this girl," and she said "No, you did it, you shouldn't have grabbed it." On cross-examination he said he couldn't swear that the gun went off before he got around the side of the car where defendant and Doris were fighting and holding each other, scuffling with hands on each other and up against the side door of his car; and he couldn't tell whether she had been shot or not, truthfully speaking, as no one said a word. He didn't recall hearing more than two shots, but did not know for sure how many times the gun went off, but during the scuffling the gun was pointed at Doris. John had been drinking that morning and the night before.

A police officer testified as to what defendant told him, that "She said as she was running across the street, the gun seemed to be jumping out of her pocket"; that when she had it in her hand the way she illustrated it, "it was in a firing position," and that she would have had the butt in her hand. "She thought it was jumping—coming out of her pocket and she grabbed it."

The defendant, on cross-examination, relating to the gun, denied the officer's version of her statement and said: "I never had control of that gun. * * * To the best of my knowledge my first notice of the gun is when it started to fall and John and myself grabbed for the gun at the same time."

Defendant has assigned errors numbered one to seven, inclusive. Upon examination of the record as to the errors numbered one to six, inclusive, we find the same not well taken or nonprejudicial, but we also find that the assignment of error numbered seven is well taken, to wit, the court erred in refusing to charge upon the lesser included offense of manslaughter as requested by both the state and the defendant.

We are, therefore, confronted with the question whether in a trial on an indictment for murder in the second degree a charge to the jury is warranted as to manslaughter upon any evidence in the record tending to support a charge of manslaughter under the rule enunciated in the cases of *Bandy* v. *State* (1921), 102 Ohio St. 384, 21 A. L. R. 594, and approved in the first paragraph of the syllabus in *State* v. *Patterson* (1961), 172 Ohio St. 319, the nexus maintained by the Supreme Court for forty years, such charge having been requested by both counsel for the state and the defendant.

In connection with the requests for an instruction on a lesser included offense of manslaughter, the trial judge made the following statement:

"The Supreme Court of the state of Ohio has said that it's within my discretion whether I charge on an included offense or not, and the court didn't feel that there was any included offense. In fact, the Supreme Court has held that if I refuse it, it is beneficial to the defendant and prejudicial to the state and that the state can predicate no error. That's right. But I was requested to charge on manslaughter and I refused."

Section 2901.06, Revised Code, entitled "Manslaughter in

the first degree," provides: "No person shall unlawfully kill another." The penalty for violation is imprisonment for no less than one, nor more than twenty years.

The pertinent part of Section 2945.74, Revised Code, provides for conviction of a lesser offense as follows:

"The jury may find the defendant not guilty of the offense charged but guilty of an attempt to commit it if such attempt is an offense at law. When the indictment or information charges an offense, including different degrees, or if other offenses are included within the offense charged, the jury may find the defendant not guilty of the degree charged but guilty of an inferior degree thereof or lesser included offense."

In construing that statute in *State* v. *Kuchmak* (1953), 159 Ohio St. 363, the Supreme Court propounded a test as to lesser included offenses at pages 366 and 367, in the opinion by Hart, J., as follows:

"* * * The test for the determination of this problem is that, if all the elements of a separate offense are present with others in an offense charged in an indictment, such separate offense is a lesser included offense; or, where all the elements of an offense are included among the elements of a charged offense, the former is a lesser included offense. But to warrant a conviction of such lesser included offense, another limitation must be taken into consideration. A court may not charge upon, and a defendant may not be found guilty of, a lesser offense, unless the evidence tends to support each of the necessary elements of such an offense. *Bandy* v. *State*, 102 Ohio St. 384, 131 N. E. 499, 21 A. L. R. 594.

"Typical examples of lesser included offenses are to be found within the offense of murder in the first degree, *i. e.*, manslaughter, assault and battery, and assault. All the elements of each are included in the elements of murder in the first degree. Under the statute murder in the second degree is also included within murder in the first degree, as an offense 'including different degree.' "

In *Freeman* v. *State* (1928), 119 Ohio St. 250, at page 254, it is reiterated:

"* * * The rule has often been established by this court that where the evidence justifies it, the lesser degrees of an included offense must be charged; if there is no evidence tend-

ing to prove the lesser degree, the court need not charge in that respect.

"The later cases in this court announcing this principle are *Bandy* v. *State*, 102 Ohio St. 384, 131 N. E. 499, 21 A. L. R. 594, and *Windle* v. *State* 102 Ohio St. 439, 139 N. E. 22.* * *"

In the *Windel case* the defendant was indicted and tried under the statute for purposely and unlawfully killing an officer, and he offered testimony tending to prove that the killing was not done purposely or unlawfully but in a scuffle and unintentionally, which placed a duty on the court to charge on a lesser degree than guilty in the first degree, and if such testimony tends to prove that such killing, although unintentional, was caused by the defendant while resisting arrest the court should charge the degree of manslaughter.

We find in the case of *State* v. *Cochrane* (1949), 151 Ohio St. 128, a pertinent holding in the second paragraph of the syllabus as follows:

"If in the trial on an indictment for murder it is possible under the evidence to acquit the defendant of murder in the first degree, of murder in the second degree, and of manslaughter because the evidence fails to establish beyond a reasonable doubt a causal connection between the criminal agency and the cause of death or because the evidence fails to establish any other essential element of such offenses, it is competent for the jury where the evidence warrants it, to find the defendant guilty of assault and battery only, and under such circumstances it is error to the prejudice of the defendant to refuse a request to charge on the lesser offense of assault and battery."

Later in the case of *State* v. *Hreno* (1954), 162 Ohio St. 193, Hart, J. (who also wrote the opinion in the case of *State* v. *Kuchmak, supra*), with unanimous concurrence of all members of the court, stated on page 196 as follows:

"This court in the case of *State* v. *Kuchmak*, 159 Ohio St. 363, 112 N. E. 2d 371, construing the statute just quoted, held that a defendant may be found not guilty of the offense charged but guilty of a lesser included offense, and that an offense is a lesser included offense where all the elements of such offense are present with others in the offense charged in an indictment. Under such circumstances, the defendant suffers no prejudice, where the evidence establishes his guilt of such lesser offense.

"Where the elements of another offense are not included among those of the offense charged in the indictment, the defendant cannot be found guilty of such other offense under the indictment. However, if certain but not all of the elements of the offense charged in the indictment constitute in themselves an offense, then such offense is a lesser included offense."

In *State* v. *Taylor* (1957), 104 Ohio App. 422 (motion for leave to appeal to the Supreme Court, overruled December 18, 1957, rehearing denied January 15, 1958), it is held that manslaughter in the first degree is an included offense in murder in the second degree. The prosecution was for murder in the second degree. The court noted Sections 2901.05 and 2901.06 of the Revised Code and cited *State* v. *Kuchmak, supra.* In the case of *State* v. *Carter* (1944), 75 Ohio App. 545, it is held that, where manslaughter is a lesser included offense, it is the duty of the court to divide manslaughter into its two divisions, voluntary and involuntary, and the failure of the court to do so is reversible error.

The evidence in this case gleaned from the record, and set forth at length hereinabove, may not be sufficient in the composite mind of the jury to raise a reasonable doubt as to the killing being "purposely and maliciously," but nevertheless, notwithstanding, the evidence herein is sufficient to encompass the elements and requisites of homicide either (1) upon sudden provocation or hot blood, (2) or in the commission of an unlawful act, the dichotomy constituting voluntary or involuntary manslaughter in the first degree, manifestly an issue under the evidence in this case. It follows, therefore, as a duty of the court to charge the lesser included offense of manslaughter, and a duty no different from its duty to charge the jury with reference to the issue of murder in the second degree. *Todor* v. *State* (1925), 113 Ohio St. 377.

The case of *State* v. *Quatman* (1954), 96 Ohio App. 517, following the rule in *Todor* v. *State, supra*, holds that where lesser offenses are included in the offense charged in an indictment, and, upon trial, a lesser included offense becomes an issue in the case, the duty of the court to charge the jury as to such lesser offense is no less than its duty to define the issues involved in the offense charged in the indictment; and, further, that in such case the omission of the court to charge the jury

on such lesser included offense when requested by defendant is prejudicially erroneous.

We are constrained to comment with full acknowledgment of deference on the second paragraph of the syllabus of *State v. Patterson, supra.* The technical rule therein invoked is *ad hoc*, peculiar to and confined to the facts and circumstances in that case, in view of the public enormity, type and severity of the homicide, dissimilar to the case before us, and therefore not controlling as to the facts and circumstances in this case; and, furthermore, especially since the cases in the Supreme Court referred to herein and applicable to this case have not been modified or overruled.

We are mindful of the difficulty confronting the trial judge in ascertaining and delineating the lesser included offense to be charged, but it is incumbent under the evidence and the law and his duty to do so, recognizing that the jury may believe all, part or none of the state's evidence. The dangerous alternative arises and of concern not only to the accused but to the state that a man guilty of only the lesser crime may be convicted of the higher on insufficient evidence, or result in a murderer being acquitted because the state has failed to prove an element of the higher crime. The jury should not be denied its right to pass upon the credibility and weight of the evidence by the failure of the court to charge a lesser included offense where there is evidence tending to support a charge of a lesser included offense.

It is, therefore, concluded that the judgment of the Common Pleas Court should be, and it hereby is, reversed and the cause remanded to that court for a new trial.

*Judgment reversed.*

DEEDS and FESS, JJ., concur.